

FILED
11-4-2011
NOV 0 4 2011 NF

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AO 91 (REV.5/85) Criminal Complaint

AUSA Stephen P. Baker (312) 353-1598
AUSA Megan Cunniff Church
AUSA Anthony P. Garcia

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**MAGISTRATE JUDGE KEYS**

UNITED STATES OF AMERICA

v.

JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;"
EZEQUIEL LOPEZ, aka "Kili;"
RODOLFO VARGAS, aka "Junior;"
JOHN DOE, aka, "ARMANDO;" and
BENITO SALINAS

**CRIMINAL COMPLAINT**

CASE NUMBER: **11CR 795**

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: In or about June 2011 through November 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;" EZQUIEL LOPEZ, aka "Kili;" defendants herein:

conspired with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, 1000 grams or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance,

in violation of Title 21, United States Code, Sections 841(a) and 846; and JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;" RODOLFO VARGAS, aka "Junior;" JOHN DOE, aka, "ARMANDO;" and BENITO SALINAS defendants herein:

conspired with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance,

in violation of Title 21, United States Code, Sections 841(a) and 846.

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant, NEESHAN TULSHI
Special Agent, Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

November 4, 2011                    at        Chicago, Illinois
Date                                           City and State

ARLANDER KEYS, U.S. Magistrate Judge
Name & Title of Judicial Officer                Signature of Judicial Officer

## AFFIDAVIT

I, NEESHAN TULSHI, being duly sworn, deposes and states as follows:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been employed by the DEA since 2001.  Prior to my assignment with DEA, I worked as an Investigator with the New York State Inspector General's Office for approximately two years.

2.      My official DEA duties include investigating criminal violations of the federal narcotics laws, including but not limited to: possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846.  Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money laundering investigations and conspiracy and complex investigations.  I have been involved in various types of electronic surveillance, including the interception of wire communications, the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, the laundering and concealing of proceeds from drug trafficking and the street gangs who participate in these illegal activities.

3.      As a result of these investigative activities, I have conducted and participated in several investigations with DEA that have resulted in the seizure of multiple kilograms of cocaine, heroin, and marihuana.  I am familiar with and have

1

participated in all of the normal methods of investigation, including but not limited to visual and video surveillance, questioning of witnesses, controlled deliveries, use of search and arrest warrants, management and use of informants, and pen registers. I know, based upon the above experience, that drug traffickers and money launderers utilize telephones, pagers, and trapped vehicles to facilitate their illegal activities.

4. The information contained in this Affidavit is based on my participation in this investigation; my conversations with and review of reports prepared by agents in the DEA, as well as other federal agencies and other law enforcement agents and officers; the results of physical surveillance; agents' review of conversations intercepted pursuant to Court orders authorizing the interception of wire communications; my training and experience; and the training and experience of other law enforcement officers I have consulted. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

## I.  PURPOSE OF AFFIDAVIT

5. This Affidavit is made for the purpose of establishing probable cause in support of a complaint charging:

a. JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;" and EZEQUIEL LOPEZ, aka "Kili;" with conspiring with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely,

2

1000 grams or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846; and

b. JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;" RODOLFO VARGAS, aka "Junior," JOHN DOE, aka "ARMANDO," and BENITO SALINAS with conspiring with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

## II.    BACKGROUND

6.    Since 2007, DEA has been involved in the investigation of Oscar LNU, aka "Oscarin," Jose Gonzalez-Zavala, aka "Panda," and others concerning their involvement in violations of federal law, including conspiracy to distribute narcotics. As part of that investigation, through Court-authorized wire interceptions, physical surveillance, and traffic stops, agents identified Antonio Mendoza, aka "Monster," as a Chicago area cell head for a drug trafficking organization's ("DTO") distribution efforts in this area.    Mendoza accepted narcotics from the DTO and distributed narcotics to various wholesale distributors in the Chicago area.  Roberto Sandoval-Velasco and Manuel Chavez, aka "Meno," were identified as workers for Mendoza

3

and the DTO in Chicago, aiding in Mendoza's distribution efforts. The DTO is operated out of Mexico, and distributes narcotics in various areas in the United States including Texas, Georgia, and Illinois. The distribution efforts are coordinated out of Mexico with the different areas to provide for unified efforts in the distribution of narcotics and collection and return to Mexico of cash drug proceeds. Communications intercepted over Mendoza's phones and surveillance also indicated that Adolfo Lopez-Garcia, aka "Flaco," and Gonzalo Lopez-Garcia, aka "Don Guma," were sources of cocaine supply for Mendoza, supplying him with wholesale amounts of cocaine on a "fronted" basis, meaning that the cocaine was supplied on credit.

7. On April 26, 2010, Mendoza, Sandoval-Velasco, Chavez, Adolfo Lopez-Garcia, Gonzalo Lopez-Garcia, and Corey Scott were charged by criminal complaint in case number 10 CR 333 with conspiracy to possess with intent to distribute and to distribute controlled substances, namely, five kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846. Adolfo Lopez-Garcia and Gonzalo Lopez-Garcia were arrested the following day, April 27, 2010. Mendoza, Sandoval-Velasco, Chavez, Adolfo Lopez-Garcia, Gonzalo Lopez-Garcia, and Corey Scott were subsequently indicted on drug conspiracy and related charges, and the case is pending before Judge James B. Zagel of the U.S. District Court for the Northern District of Illinois, Eastern Division. Interceptions over Adolfo Lopez-

Garcia indicated that VILLA was a source of supply of wholesale amounts of cocaine to Adolfo Lopez-Garcia.

8.     In the process of this investigation, the government sought and the Court granted authority to intercept the following wire and electronic communications:

a.     On June 17, 2011, Acting Chief Judge Ruben Castillo entered Orders (the "Orders of June 17, 2011") authorizing the interception, for a 30-day period, of wire communications to and from **Target Phone 14** and the various and changing cellular telephones used by VILLA.1  Law enforcement interception of **Target Phone 14** and various and changing cellular telephones used by VILLA commenced on June 17, 2011.  Law enforcement interception of communications of **Target Phone 14** pursuant to this order continued until June 18, 2011.   Law enforcement intercepted the  communications of the various and changing cellular telephones used by VILLA pursuant to this order, which included interception over **Target Phones 15, 16, 17, 19, 20, 21, and 22**, until July 16, 2011.

b.     On July 18, 2011, Chief Judge James F. Holderman of the Northern District of Illinois entered Orders (the "Orders of July 18, 2011") authorizing the interception, for a 30-day period, of wire communications to and from **Target Phones 20, 21, and 22** and various and changing cellular telephones used by VILLA which included interception over **Target Phones 23 and 24**.  Law enforcement interception of communications of **Target Phones 20, 25, and 26**

---

1     VILLA was originally identified in the order by his alias, Salvador Lopez, but he was subsequently identified as VILLA.

pursuant to this order continued until August 25, 2011 for **Target Phone 20** and **Target Phone 26**, and August 24, 2011, for **Target Phone 25**.

       c.     On August 18, 2011, Chief Judge James F. Holderman of the Northern District of Illinois entered Orders (the "Orders of August 18, 2011") authorizing the interception, for a 30-day period, of wire communications to and from **Target Phones 20, 25, 26** and the various and changing cellular telephones used by VILLA which included interception over **Target Phone 28, Target Phone 29 and Target Phone 30**. Pursuant to an extension granted on September 16, 2011, law enforcement interception of communications of **Target Phones 28 and 29** continued until September 16, 2011, and law enforcement interception of communications over **Target Phone 30** continued until October 1, 2011.

       d.     On September 16, 2011, Chief Judge James F. Holderman of the Northern District of Illinois entered Orders (the "Orders of September 16, 2011") authorizing the interception, for a 30-day period, of wire communications to and from **Target Phones 28, 29, 30** and the various and changing cellular telephones used by VILLA, which included interception over **Target Phone 31 and Target Phone 32**. Pursuant to this Order, law enforcement interception of communications of **Target Phones 28 and 29** continued until September 16, 2011, and law enforcement interception of communications of **Target Phone 30** continued until October 1, 2011. Law enforcement interception of communications of **Target Phones 31 and 32** pursuant to this order continued until October 15, 2011.

       e.     On October 17, 2011, Chief Judge James F. Holderman of the

Northern District of Illinois entered Orders (the "Orders of October 17, 2011") authorizing: the interception, for a 30-day period, of wire communications to and from **Target Phones 31** and **32**; and the various and changing cellular telephones used by VILLA. Pursuant to this Order, law enforcement interception of communications of **Target Phone 31** continued until October 22, 2011 and the interception of **Target Phone 32** continues. On October 17, 2011, the government began intercepting the wire communications of VILLA over **Target Phone 33** and **Target Phone 34**. Pursuant to this Order, law enforcement interception of communications of **Target Phones 33** and **34** continues.

## III. PROBABLE CAUSE

9. Based upon investigation and the interceptions listed below, I believe that VILLA is now operating as a Chicago area cell head for the DTO's distribution efforts in this area. VILLA is accepting narcotics from the DTO and distributing narcotics to various wholesale distributors in the Chicago area. EZEQUIEL LOPEZ, aka "Kili;" (hereinafter "LOPEZ") and JOHN DOE, aka "ARMANDO," (hereinafter "ARMANDO") are workers for VILLA and the DTO in Chicago, Illinois, aiding in VILLA's distribution efforts. Communications intercepted over VILLA's phones and coordinated surveillance also indicate that RODOLFO VARGAS, aka "Junior," (hereinafter "VARGAS") is a marijuana source of supply for VILLA, supplying him with wholesale amounts of marijuana on a fronted basis, that is providing him the marijuana on credit, pending repayment from VILLA's customers. BENITO SALINAS (hereinafter "SALINAS") is a narcotics proceeds courier, who picks up drug proceeds from VILLA, collected from the sale of

7

marijuana for the DTO, and transports the proceeds to Mexico.

10.    As detailed below, VILLA's drug trafficking activities with the DTO involved the distribution of approximately 13 kilograms of heroin in June of 2011, and approximately 1,000 pounds of marijuana in July and August of 2011. VILLA and LOPEZ distributed the heroin in June of 2011. In August of 2011, VARGAS supplied VILLA with marijuana. VILLA and ARMANDO distributed the marijuana to their wholesale customers and collected payment. VILLA and ARMANDO then delivered $311,000 in narcotics proceeds to SALINAS for transportation to Mexico in repayment to the DTO. Law enforcement stopped SALINAS's tractor trailer on August 6, 2011 and seized the $311,000 in narcotics proceeds.

**A.    Interceptions over VILLA's phones lead to the seizure of 13 kilograms of heroin.**

    **i.    On June 19, 2011, INDIVIDUAL A received 5 kilograms of heroin from and dropped off $40,000 in payment to VILLA's drug operation.**

11.    On June 19, 2011, at approximately 9:46 a.m. (Call #34), VILLA,[2] who

---

2    VILLA was identified as the speaker in this and the subsequent conversations in this affidavit in the following manner: on June 3, 2011, at approximately 12:30 p.m., agents conducted a trash pull at 1813 N. 35th Ave, Stone Park, Illinois, the address identified through surveillance in the course of the investigation of VILLA as his regular residence. Following the trash pull, agents discovered a T-Mobile receipt for telephone number 773-474-1938, subscribed to "Salvador Lopez, PO Box 410711, Chicago IL." Agents searched the Lexis/Nexis database for PO Box 410711 which showed a listing for Jorge OVILLA with a DOB as April 16, 1973 with a residence listed of 4509 W. Altgeld, Chicago, Illinois. Agents discovered an Illinois driver's license for Jorge Ovilla listed as O14042073109 registered as not valid or with no photograph available. Agents then conducted an Illinois Soundex search for Jorge VILLA and found a Jorge O. VILLA at 4509 W. Altgeld, Chicago, Illinois with Illinois driver's license # V40043473109, date of birth April 16, 1973. Agents confirmed the driver's license photo of Jorge O. Villa to be the individual targeted during the investigation using the **Target Phones**. In the June 17, 2011 wiretap affidavit, the government identified VILLA by his alias "Salvador Lopez," based upon the name recovered from cell phones receipts found in his trash and upon the

8

was using **Target Phone 15**, had a telephone conversation with INDIVIDUAL A.[3] During the conversation, VILLA and INDIVIDUAL A discussed the price for kilogram quantities of heroin.[4] Specifically, INDIVIDUAL A stated, "My nephew, I love you. You got good news for me, don't you?" VILLA answered, "No, I am sorry. Your price is no good. 54?" [VILLA told INDIVIDUAL A that the price per kilogram of heroin INDIVIDUAL A wanted to pay was too low and that VILLA wanted to sell them for $54,000 per kilogram.] INDIVIDUAL A responded, "I don't want that stuff. This guy got something that it's real strong and he said, he would give you fifty for 'em and he's going to mix it with his shit he got." [INDIVIDUAL A had a heroin customer who was only willing to pay $50,000 per kilogram of heroin.

---

registration of a car he had been observed driving.

3    As detailed below, law enforcement identified INDIVIDUAL A as a wholesale heroin customer of VILLA's through wire interceptions, surveillance and a June 23, 2011, traffic stop which lead to the recovery of 6 kilograms of heroin. Following the seizure, INDIVIDUAL A began providing information to law enforcement in the hopes of receiving consideration for any subsequent criminal charges. Because of the covert nature of this investigation, INDIVIDUAL A has not been fully debriefed about his criminal activity and his criminal relationship with VILLA. Consequently, the government does not rely on his information for the purpose of the allegations in this complaint, but instead only alleges the activity of INDIVIDUAL A which has been corroborated as detailed below through surveillance, intercepted communications, consensual recordings, and seized narcotics. INDIVIDUAL A has multiple arrests and convictions, including charges for violent crimes and drug related offenses.

4    Reference is made to intercepted conversations in this affidavit. In certain instances, these conversations are summarized and placed in context. My understanding of these conversations is aided by the contents and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, my discussions with other law enforcement officers, the experience of other law enforcement agents and officers in this investigation and other evidence developed during the course of the investigation. The times listed for the recorded conversations are approximate. Further, summaries of the recorded conversations herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals. Finally, for these recordings that were originally intercepted in Spanish, I have relied on draft - - not final - - English translations of conversations in Spanish done by DEA agents and/or interpreters.

INDIVIDUAL A stated his customer had better quality heroin and he was going to mix the lower quality heroin he purchased from VILLA with the higher quality he already possessed.] VILLA responded, "This is not enough money for me and Pepe. This our price fifty-four, man." [VILLA stated that the price was $54,000 per kilogram of heroin.]

12.     On June 19, 2011, at approximately 9:47 a.m. (Call #35), VILLA, who was using **Target Phone 15**, had a telephone conversation with INDIVIDUAL A. During the conversation, VILLA and INDIVIDUAL A continued to discuss the price for a kilogram of heroin and INDIVIDUAL A stated that INDIVIDUAL A would come to pick up five kilograms of heroin. Specifically, VILLA stated, "The price, the price. Please, sir. You help, man. 54. This is fine, man." [VILLA stated that the price for a kilogram of heroin was $54,000.] INDIVIDUAL A stated, "Alright, try, try for 52. He might go for, he might pay 52. I'm a call him and I'll call you back. See if he goes 52 for you. He don't go 54, 'cause he's just going to take that and mix with the one. He got something that's real, real strong." [INDIVIDUAL A stated that he would see if his customer would pay $52,000 per kilogram for the heroin and explained that his customer was going to mix VILLA's heroin with other stronger heroin.] VILLA stated, "Alright sir, sir. Listen, man, listen. . . one dollar more. 53, you coming, you coming for these you returned, okay? Please, man." [VILLA stated that he would sell the heroin for $53,000 per kilogram and then asked if INDIVIDUAL A was coming to pick up the drugs at that price.] INDIVIDUAL A responded, "I'm a help you [U/I]." VILLA asked, "What you say?" INDIVIDUAL A

stated, "That means I'm a have to put one with my own money before he take it. I'll come and get his five. I'm on my way now. I'm a come and get 'em, man, for you to help me. But when is the Pepe going to come, 'cause I don't have nothing. I need the Pepe, man." [INDIVIDUAL A stated that he would take five kilograms of heroin at that price and asked when VILLA's new supply of heroin would arrive from "the Pepe."] VILLA stated, "I don't know, man. They're supposed to arrive yesterday and the last fucking day and now. . . I don't know, man. I don't know. And you got the money for these five you returned? The 53?" INDIVIDUAL A stated, "No, I'm coming right now 'cause I'm gonna give it to 'em. I got to take it to 'em. I got to drive 18 hours to take it to 'em. So I'm a come get 'em right now. I'll be there in. . . I'll be there at 11:00." VILLA stated, "Alright, 11:00. One hour, right?" INDIVIDUAL A stated, "Yes. Yes, sir."

13.    On June 19, 2011, at approximately 9:49 a.m. (Call #136),    VILLA, who was using **Target Phone 16**, had a telephone conversation with LOPEZ who was using telephone number (773) 746-4381.[5] During the call, VILLA explained to LOPEZ that INDIVIDUAL A would be coming to pick up heroin in about one hour.

---

5    The identification of LOPEZ on this and other phone conversations in this complaint is based on the following: (1) DEA monitors recognized the voice of the user of telephone number (773) 746-4381 as belonging to LOPEZ, identified as "Kili" in calls intercepted over the **Target Phones**; (2) in conjunction with the use of Court authorized cellular location information for telephone number 847-372-2292, a number over which LOPEZ had been intercepted where he was identified as "Kili" on the **Target Phones**, (for instance, in call number 127, intercepted over **Target Phone 16**, VILLA identified LOPEZ as "Kili") law enforcement conducted a traffic stop of LOPEZ on June 27, 2011, and identified him as Ezequiel U. Lopez from a Mexican identification when he did not have a lawful driver's license and was arrested; and (3) during the course of INDIVIDUAL A's cooperation, INDIVIDUAL A made recorded phone calls to LOPEZ on telephone numbers which LOPEZ had been intercepted using over the **Target Phones** and INDIVIDUAL A recognized LOPEZ's voice as that of one of his suppliers for heroin.

Specifically, VILLA stated, "What's going on?" LOPEZ stated, "What's up, man?" VILLA stated, "Listen, [INDIVIDUAL A] is coming in an hour for what . . . what he gave you back." [VILLA told LOPEZ INDIVIDUAL A was coming in an hour to pick up heroin.] LOPEZ stated, "Okay, sounds good."

14.    On June 19, 2011, at approximately 10:42 a.m. (Call #139), VILLA, who was using **Target Phone 16,** had a telephone conversation with LOPEZ, who was using telephone number (773) 746-4381. During the call, LOPEZ asked VILLA how much they were charging INDIVIDUAL A for the five kilograms of heroin. Specifically, LOPEZ stated, "Listen, how much are those going to be?" VILLA responded, "At 5-3." [$53,000 per kilogram.] LOPEZ stated, "5-3?" VILLA responded, "Yes, the rest will be at the price they were before . . . but these are going to be at 5-3." LOPEZ stated, "These five, at 5-3?" VILLA responded, "Exactly. I already spoke to him, but remind him because you know he can be an ass." LOPEZ stated, "Yes, that's why I called you. That way I can do the math and all." VILLA responded, "Sounds good."

15.    On June 19, 2011 at approximately 11:10 a.m. (Call #141), VILLA, who was using **Target Phone 16**, had a telephone conversation with LOPEZ, who was using telephone number (773) 746-4381. During the call, LOPEZ told VILLA that, when INDIVIDUAL A picked up the five kilograms of heroin, INDIVIDUAL A brought payment for prior fronted heroin. Specifically, LOPEZ stated, "Hey, he brought a 40 year-old guy." [LOPEZ stated that INDIVIDUAL A brought $40,000 in payment for the prior heroin.] VILLA stated, "Oh, shit!" LOPEZ stated, "Yeah."

VILLA stated, "That's good." LOPEZ stated, "So, what do you think?" VILLA asked, "Did he say anything about last times things?" [VILLA asked if INDIVIDUAL A said anything about the quality of the previously fronted kilograms of heroin.] LOPEZ stated, "Uh. . ." VILLA stated, "In other words, what he brought that was a little over?" LOPEZ stated, "No. I don't think the dude knows." VILLA stated, "That motherfucker got screwed. That's more or less what he's screwed me over with, right? No, not yet, right?" [VILLA stated that INDIVIDUAL A had paid too much for the prior heroin due to its quality or amount.] LOPEZ stated, "No. . . You know that the other was . . . yes, he's still a little short." VILLA stated, "That motherfucker got screwed. You better not mention anything. If he says something, we'll say, 'no, that's how much it was.' Screw him. Uh. . . You can take it over there and we'll give it to Huicho later on . . or if not tomorrow." LOPEZ asked, "Should I take it over there?" [LOPEZ asked VILLA if he should move the drug proceeds to another location.] VILLA stated, "Yes, take it over there or put it away right there. It's up to you." LOPEZ stated, "No, I think I'm going to take it." VILLA stated, "Okay, take it and put it away somewhere." LOPEZ stated, "I'll bring it with me tomorrow or the day after and we'll give him everything." VILLA stated, "There you go, yes. Let's do it like that."

       a.    **INDIVIDUAL A arranges to return heroin to VILLA due to its poor quality.**

16. On June 20, 2011, at approximately 6:27 p.m. (Call #57), VILLA, who was using **Target Phone 15,** had a telephone conversation with INDIVIDUAL A. During this call, INDIVIDUAL A complained about the quality of the heroin and

arranged to return it. Specifically:

      a.     INDIVIDUAL A stated, "Tequila, Man! A lot of problems, man. They don't want this cut, the other people I sold some to, they . . . I got to go back and return theirs." [INDIVIDUAL A complained that the heroin VILLA gave him was of poor quality, that his customers did not like it, and that he would have to return it.]

      b.     Later in the call, VILLA stated, "Okay. Oh shit. How many you return, man?" INDIVIDUAL A stated, "The last five plus four more. That last I just came to pick up, plus 4 more that I had sold to the people. They know better than that, man! They cut that fucking shit, and my man, he's going to give you the 53 and when he check it . . . Man, that shit ain't no good, man!" VILLA stated, "Um, the three and the more four? Were too?" [VILLA asked if all the kilograms of heroin were of poor quality.]

      c.     INDIVIDUAL A stated, "Returned man! I won't be back until tomorrow at night, so it'll be like Thursday morning. I'll see you, 'cause I got to go and pick this other stuff, they called me all fucking day, I'm so fucking mad! And the guy showed me, he tested that fucking shit; it ain't no fucking good! I don't know why they do that fucking shit!" VILLA asked, "Oh my god and you coming tomorrow night?" INDIVIDUAL A stated, "Yeah, I'll see you Thursday morning, man. Fucking problems!" VILLA stated, "Oh my god. And you return five and more, right?" INDIVIDUAL A stated, "Yes, five and four, Nine all total. Fucking bullshit, man!" VILLA stated, "Okay, I'm sorry, man. Please, not broken, okay?

It's not a problem, if you return complete and not broken, not a problem for me and you, never." [VILLA explained that he would accept the heroin if the kilogram packages were not open and mixed with additional cutting agents.] INDIVIDUAL A stated, "They are not broken. They are not broken, man! Fucking bullshit, man! They prepped it real good and then they cut the fucking shit, they didn't bring it like. . . with the one and a half with the 500 sticks, the motherfuckers they cut. . ."

d. VILLA stated, "Yeah, I understand. Okay sir, I'm sorry for me, for Pepe, you understand. . . I mean for me no problem. I see when you coming." INDIVIDUAL A stated, "All right, man. Cause they're much problems." VILLA stated, "Maybe when you come it'll change. Different work." [VILLA stated that perhaps when INDIVIDUAL A returned the heroin there would be new heroin of better quality.] INDIVIDUAL A stated, "I hope so, man. I hope so. Thank you."

17. On June 21, 2011, at approximately 10:25 p.m. (Call #345), VILLA, who was using **Target Phone 16**, had a telephone conversation with LOPEZ, who was using telephone number (847) 372-2292. During the call, VILLA and LOPEZ discussed how to handle the exchange of heroin with INDIVIDUAL A. Specifically, LOPEZ stated, "How do you want me to do it tomorrow to see, [INDIVIDUAL A's nickname]?" VILLA stated, "This dude is not picking up." LOPEZ stated, "So, it's not going to be done?" VILLA stated, "No, yeah I think it's going to be done." LOPEZ stated, "Oh, yeah?" VILLA stated, "Yeah." LOPEZ stated, "So?" VILLA stated, "How should we do it?" LOPEZ stated, "Because you said everything should be taken to the lady, right?" VILLA stated, "Yeah, we'll see when this guy comes."

15

LOPEZ stated, "Yeah?" VILLA stated, "Yeah. He can come and then he can leave and then come back in the evening." LOPEZ stated, "Okay, so just for him to come and leave me that, and later or another day come and get the other ones." [LOPEZ stated that INDIVIDUAL A should come and drop off the unwanted heroin and later come back for kilograms of heroin of better quality.] VILLA stated, "Yeah, he can come later but it's better if he comes another day." LOPEZ stated, "Okay, then uh. . . so all seven from the lady that I have here are going to be given to him?" [LOPEZ asked VILLA if all seven kilograms of heroin he had should go to INDIVIDUAL A.] VILLA stated, "Yeah, everything." LOPEZ stated, "Because there's another one, dude. Do you remember the last contract that was eight, but only seven went, and one was left?" [LOPEZ referenced a prior delivery of heroin to a different customer in which only seven of eight total kilograms were delivered.] VILLA stated, "Yeah, one of the old ones, that was returned to him and he gave it back, right?" LOPEZ stated, "Exactly, that you gave it to him before I arrived."

18.     On June 22, 2011, at approximately 12:07 p.m. (Call #361), VILLA, who was using **Target Phone 16**, had a telephone conversation with LOPEZ, who was using telephone number (847) 372-2292. During the call, LOPEZ asked, "What's going on with [INDIVIDUAL A's nickname]." VILLA responded, "He won't be back until tomorrow." LOPEZ stated, "Shit! What should I do with the stuff I brought with me? Do you want me to go and drop that off with the lady?" [LOPEZ asked VILLA what he should do with the extra heroin he had ready for INDIVIDUAL A.] VILLA stated, "Let me call this guy, and I'll call you back. We'll

see what we can do about that."

19.     On June 22, 2011, at approximately 1:16 p.m. (Call #365), VILLA, who was using **Target Phone 16**, had a telephone conversation with LOPEZ, who was using telephone number (847) 372-2292.   During the call, VILLA and LOPEZ discussed INDIVIDUAL A's return of heroin and resupply.   Specifically, LOPEZ stated, "So, then, [INDIVIDUAL A's nickname] is coming tomorrow?"   VILLA stated, "Yeah.   For sure tomorrow."   LOPEZ stated, "Okay, so, then I'm going to leave the things here."   VILLA stated, "Okay."

20.     On June 22, 2011, at approximately 5:00 p.m. (Call # 84), VILLA, who was using **Target Phone 15**, had a telephone conversation with INDIVIDUAL A. During the call, VILLA and INDIVIDUAL A discussed LOPEZ's failure to answer his phone.  Specifically, INDIVIDUAL A stated, "Where's your cousin's phone at?  Is your cousin's phone turned off?"   VILLA stated, "No, he says is [U/I], man." INDIVIDUAL A stated, "I've been trying to call your cousin, man.  He don't answer, man.  His phone. . .  His phone is cut off."  VILLA stated, "Is his phone turned off or power?"  INDIVIDUAL A stated, "It's saying non-reachable, so it must be cut down. Call him and give him my new number.   Call him and give him my new number." VILLA stated, "Okay, I'm going to call my cousin, this is. . .  the new number, okay." INDIVIDUAL A stated, "All right."  VILLA stated, "Thank you, my uncle."

21.     On June 22, 2011, at approximately 5:02 p.m. (Call #385), VILLA, who was using **Target Phone 16,** had a telephone conversation with LOPEZ, who was using telephone number (847) 372-2292. During the call, VILLA stated, "Hey, dude.

[INDIVIDUAL A's nickname] is saying that he's been calling you. Because he changed his number. . . and he's saying that yours is turned off. Is that true?" LOPEZ stated, "Well, it's probably on. It's because I left it at home. I'm out in the street." VILLA stated, "Oh. Well, then check your phone when you get there. If not, I'll give you the number, because he wants to talk to you." LOPEZ stated, "No, it has to be on. Because I left it there in the morning, it's just that when I came out I left in a hurry, to put that for the guy, and I forgot to bring it with me." VILLA stated, "Oh, well, check your phone. Maybe you'll see that he called, because you know how this dude is." LOPEZ stated, "Yeah, as soon as I get there, I'll call him back."

### b. Law Enforcement Stops INDIVIDUAL A and seizes 6 kilograms of Heroin on June 23, 2011.

19. Based in part upon the interceptions listed above, on June 21, 2011, Chief Judge Holderman signed an order granting authority to use cellular location technology to locate INDIVIDUAL A's phone. On June 22, 2011, DEA agents, while using both surveillance and the cellular location information, identified INDIVIDUAL A.

20. On June 23, 2011, based in part on the intercepted calls indicating that INDIVIDUAL A was returning numerous kilograms of heroin to VILLA on the morning of June 23, 2011, surveillance, the use of cellular location information, law enforcement located and subsequently observed INDIVIDUAL A driving his vehicle in the area of Fullerton and Kostner in Chicago. Law enforcement conducted a traffic stop of INDIVIDUAL A after observing INDIVIDUAL A commit various

traffic violations. After a narcotics-detecting canine subsequently gave a positive alert for the presence of narcotics inside INDIVIDUAL A's vehicle, law enforcement located six kilograms of heroin inside a duffle bag in INDIVIDUAL A's vehicle. Law enforcement advised INDIVIDUAL A of his *Miranda* rights. INDIVIDUAL A immediately agreed to cooperate with law enforcement. INDIVIDUAL A also admitted, among other things, that INDIVIDUAL A was returning kilograms of heroin and agreed to assist law enforcement in the on-going investigation.

> **c.** **INDIVIDUAL A's cooperation leads to the seizure of 7 additional kilograms of heroin from VILLA and LOPEZ.**

21. On June 23, 2011, at the direction and in the presence of law enforcement, INDIVIDUAL A placed numerous consensually-recorded telephone calls to LOPEZ at push-to-talk number 110*133*3308,[6] (hereinafter "LOPEZ phone 1") as well as to VILLA, on **Target Phone 15,** in order to obtain additional kilogram quantities of heroin. As a ruse, INDIVIDUAL A informed VILLA that INDIVIDUAL A had found a customer for the kilograms of heroin that INDIVIDUAL A had intended to return and that INDIVIDUAL A had another customer who wanted an additional quantity of heroin. In those conversations, VILLA and LOPEZ agreed to provide a kilogram of heroin to INDIVIDUAL A for INDIVIUDAL A's purported customer to sample, or check its quality.

---

6        INDIVIDUAL A identified the voice of the user of 110*133*3308 as belonging to VILLA's cousin, whom INDIVIDUAL A did not know by name. DEA monitors and agents familiar with the voice of LOPEZ recognized the voice of the user of 110*133*3308 as belonging to LOPEZ. Additionally, based on the content and context of the consensually recorded calls, and conversations between VILLA and LOPEZ intercepted over the **Target Phones,** agents identified the user of 110*133*3308 as LOPEZ.

22.    On June 23, 2011, at approximately 8:10 a.m. (Call # 105),[7] at the direction and in the presence of law enforcement, INDIVIDUAL A placed a call to VILLA, who was using **Target Phone 15**.  During the call, INDIVIDUAL A told VILLA that INDIVIDUAL A found a buyer for the six kilograms of heroin and that INDIVIDUAL A had another buyer who wanted more.  Specifically, INDIVIDUAL A stated, "I found somebody that wants the six, that's why I turned around."  VILLA stated, "You told man ten minutes, what happened?"  INDIVIDUAL A stated, "I had to turn around because the guy called me back and he say he fucking wanted the fucking shit."  VILLA stated, "Where are you now?"  INDIVIDUAL A stated, "I'm on the expressway going to take them to him.  I kept trying to call your cousin, but he didn't answer the damn phone.  I told him I was going to be about 15 minutes away, he didn't answer the phone."  VILLA stated, "Oh, in how long you coming?"  INDIVIDUAL A stated, "Probably about three or four hours.  It's an hour and a half each way."  VILLA stated, "Okay."  INDIVIDUAL A stated, "So do you have some good stuff, or better than that?  Because the other guy wants something good."  VILLA stated, "Yeah, okay."

23.    On June 23, 2011, at approximately 12:52 p.m. (Call #118), VILLA, who was using **Target Phone 15**, had a telephone conversation with INDIVIDUAL A.  During the call, VILLA explained that he was going to give INDIVIDUAL A one additional kilogram of heroin for INDIVIDUAL A's purported customer to evaluate to see if the customer wanted more.   Specifically, VILLA stated, "My uncle."

---

7    In addition to being consensually recorded by law enforcement, the call was intercepted over **Target Phone 15**.

INDIVIDUAL A stated, "You said you were going to call me back in five minutes. You don't call me back, man! I got these people waiting with this fucking money, think I'm trying to rob them or something because I ain't do what I told them." VILLA stated, "Okay, I'm sorry. Too much problems with these people. Okay? This guy, a friend of Pepe . . . You coming for only one for the look your friend, this is fine, good, okay. You come, I got more, okay? These people don't like it. . . send Pepe, no like it and return and yes and no. These people too much trouble, you see what I mean?" INDIVIDUAL A stated, "Okay, all right, I'll be there at uh . . . 2:00. Make it 1:30, man. 'Cause I'm downtown now. About 30, 40 minutes." VILLA confirmed, "At 1:30 you come, all right?"

24.     Later on June 23, 2011, INDIVIDUAL A placed another consensually-recorded call monitored by investigating agents to LOPEZ, who was using LOPEZ Phone 1. During the call, INDIVIDUAL A and LOPEZ discussed INDIVIDUAL A's need for additional heroin. Specifically, LOPEZ stated, "What's up, man?" INDIVIDUAL A stated, "Yeah, I'll be there in about fifteen minutes, man. He just gave me the one [kilogram]. I gotta take it and show 'em to him, but . . . but they, they want 'em, man. You understand? So he told me to come and get the one [kilogram]. You're over there [at the stash house on Austin in Chicago] now? 'Cause I'm about fifteen minutes away. I just got through talking to your, your cousin [VILLA]. Did you talk to him? 'Cause he told me to come and get the one [kilogram] and show it to these, these new people, to see if they want it. And then he, he'll give me the rest of 'em." LOPEZ said, "Okay, it's alright." INDIVIDUAL A

said, "I'll be there in fifteen minutes." LOPEZ said, "Okay."

25. Following the phone conversation, law enforcement searched INDIVIDUAL A and INDIVIDUAL A's car and found no narcotics or other contraband. Law enforcement subsequently conducted surveillance of INDIVIDUAL A, who drove his vehicle into the garage of the stash house located at 2327 North Austin, in Chicago, Illinois. The garage door then closed. Surveillance was unable to see inside the garage at that time. Shortly thereafter, surveillance observed INDIVIDUAL A drive out of the garage and depart the area while under constant surveillance. INDIVIDUAL A subsequently delivered the kilogram of heroin to a DEA undercover agent (UC), who was posing as his customer. Law enforcement searched INDIVIDUAL A and INDIVIDUAL A's car and found no other narcotics or contraband.

26. A short while later, in the presence of law enforcement, INDIVIDUAL A placed another consensually recorded telephone call to Nextel push-to-talk number 110*133*3308, utilized by LOPEZ. During the conversation, INDIVIDUAL A asked LOPEZ if LOPEZ could get a hold of VILLA to supply additional kilograms of heroin. Specifically, INDIVIDUAL A stated, "I was calling your uncle, [VILLA] man. He ain't answer the phone, man, and people want them, man! They got money for ten right now, man. People want them right now, man. They want it! Why he not answering the phone, man...cause I need them!" [INDIVIDUAL A advised LOPEZ that his customers had money for ten kilograms of heroin.] LOPEZ replied, "My cousin don't answer his phone?" INDIVIDUAL A responded, "No, I just

tried to call him. He's not answering the damn phone, man!" LOPEZ stated, "Okay, let me, let me call him." INDIVIDUAL A replied, "Call me back, man, cause I'm on my way back." LOPEZ replied, "Okay."

27. Following the phone conversation, law enforcement searched INDIVIDUAL A and INDIVIDUAL A's car and found no narcotics or other contraband. Law enforcement again conducted surveillance of INDIVIDUAL A as INDIVIDUAL A again drove into the garage of the stash house located at 2327 North Austin in Chicago. Surveillance was unable to see inside the garage once INDIVIDUAL A drove into the garage and the garage door was closed. Shortly thereafter, surveillance observed INDIVIDUAL A drive out of the garage and depart the area while under constant surveillance. INDIVIDUAL A subsequently met with law enforcement and provided agents with a plastic bag containing six kilograms of a substance which field tested positive for heroin. Law enforcement searched INDIVIDUAL A and INDIVIDUAL A's car and found no other narcotics or contraband. Agents took the packages seized from INDIVIDUAL A on June 23, 2011, to the DEA North Central Lab for testing.

28. On June 27, 2011, law enforcement conducted a traffic stop of LOPEZ in order to identify him. Officers arrested LOPEZ when he had no valid driver's license. Following law enforcement processing for the traffic offense, LOPEZ was released.

29. On June 27, 2011, at approximately 7:11 p.m. (Call #959), VILLA, using **Target Phone 16**, had a telephone conversation with LOPEZ, who was using

(847) 790-2626. During the call, LOPEZ informed VILLA that he had been stopped by police and that he was suspicious that INDIVIDUAL A was cooperating with law enforcement against them following LOPEZ's delivery of heroin to INDIVIDAUL A on June 23. LOPEZ further informed VILLA that he had obtained the new phone number in order to call him. LOPEZ and VILLA discussed whether law enforcement had obtained LOPEZ's phones while he was stopped. At the end of the call, VILLA told LOPEZ to stay away from his residence and provided him with instructions on where to stay. Specifically:

a. LOPEZ said, "Hey, dude, these motherfuckers [law enforcement] took me for a stroll [to the police station]." VILLA asked, "And then?" LOPEZ said, "Well, I don't know, dude." VILLA said, "Well, tell me." LOPEZ said, "Well, they took me here, where I'm at right now." VILLA said, "There on Central." LOPEZ said, "Yeah." VILLA asked, "And then?" LOPEZ said, "Well, this mother fucker just got behind me and stopped me." VILLA asked, "But which ones?" LOPEZ said, "The white ones." VILLA said, "The white ones?" LOPEZ confirmed, "Yeah, the Tahoe ones [referring to Chicago Police Department vehicles]." VILLA said, "Yeah." LOPEZ said, "Yeah." VILLA said, "And?" LOPEZ said, "Well, they let me go, and I was there for like seven hours." VILLA said, "Son of a bitch, what did they say or what?" LOPEZ said, "Dude, I thought it was weird. He just stopped me because I have the little deer hanging from the rear view mirror, but that's bullshit. Everybody has that shit and they get just me?" VILLA said, "Yeah." LOPEZ said, "So he stopped me and asked me for my license, and I told him I didn't have one

except for the Mexican one." VILLA said, "Right." LOPEZ said, "He goes, 'That's not good.' He goes, 'I'm just going to give you a ticket. I'm not going to take it from you because it has insurance.' And I thought, 'He is going to give me the fucking ticket here and he is going to let me go right here.'" VILLA said, "Right." LOPEZ said, "No, the son of a bitch took me over there, dude." VILLA asked, "To the station?" LOPEZ confirmed, "Yeah." VILLA said, "Yeah?" LOPEZ continued, "They did everything to me. They fingerprinted me. They took an inventory of everything I had. That's why I still have the phone off." VILLA asked, "And whose is this one?" LOPEZ said, "I just got this one to call you. I couldn't find a fucking public phone to call you." VILLA said, "Yeah, there is hardly any. Hey, and where did the deer [vehicle] end up?" LOPEZ said, "I left that one where they stopped me, dude." VILLA asked, "Where?" LOPEZ said, "On Oak Park. As soon as I left Felipa's, I started going and he got on me. So I went that way. I thought, 'I'm going to go to Sears, I'm going to head that way.' I didn't make to Sears and he put the lights on me." VILLA said, "Yeah?"

b.     As the call continued, LOPEZ said, "Yeah, and ever since yesterday or the day [INDIVIDUAL A] took that, I have been going around." VILLA said, "Right." LOPEZ said, "I saw a green car, when I brought him the first one." [LOPEZ said he saw a green car when he took INDIVIDUAL A the sample kilogram of heroin.] VILLA said, "Right." LOPEZ said, "I got there, I gave it to him, and I left. He stayed there, and it was running, and you know how they called me like an hour later saying he wanted the rest of them?" [LOPEZ asked if VILLA

remembered that INDIVIDUAL A called and asked for the other six kilograms within an hour of receiving the sample.] VILLA said, "Mm." LOPEZ said, "And the son of a bitch was still there playing with a phone." VILLA said, "But right there by Felipa." LOPEZ said, "Yeah, but on Mason." VILLA said, "Right." LOPEZ said, "So I went out there in the morning, there was a car on Mason, but close to Austin." VILLA said, "Right." LOPEZ said, "It was a black car, a Taurus." VILLA said, "Right." LOPEZ said, "It was on, and the guy stared at me hard." VILLA said, "But the new ones?" LOPEZ said, "It's an old one, like 2000 something." VILLA said, "Right." LOPEZ said, "So I thought, 'Let me go around to see what this guy is going to do.' So I went on Fullerton, and over here, towards the park, I saw the fucking car and a patrol car and a patrol car next to it." VILLA said, "Uh-huh." LOPEZ said, "The fucking car went in the gym, and the patrol car got on me." VILLA said, "The car went in the gym and the patrol car got on you." LOPEZ said, "Right. He followed me, but I thought it was going somewhere else. No, he followed me and he followed me to . . . I thought, 'I'm going to go to Sears so he won't follow me anywhere else.'" VILLA said, "Right." LOPEZ said, "I didn't make it. The fucker got me."

30.     Subsequent to the law enforcement activities of June 23, 2011, DEA's North Central Lab tested the contents of the final two portions of narcotics delivered to INDIVIDUAL A on June 23, 2011, one kilogram sample subsequently delivered to INDIVIDAUL A, and the six kilograms delivered to INDIVIDUAL A later the same day and found each to be heroin. The six kilogram portion seized by

law enforcement from INDIVIDUAL A during the traffic stop on June 23, 2011, field tested positive for heroin. This six kilogram amount has been sent to the lab, but results of the lab analysis are not yet available.

**B. Interceptions of VILLA's phones reveal a 1,000 pound marijuana distribution and lead to the seizure of approximately $311,000 in drug proceeds.**

31. As discussed below, ARMANDO has been intercepted over the **Target Phones** in conversations with VILLA arranging narcotics transactions and discussing transportation of the narcotics.[8] ARMANDO has been identified as a

---

8       ARMANDO was identified as the speaker on all phone calls in this complaint through voice comparison by DEA monitors based upon the following surveillance information observed in conjunction with intercepted conversations:  On July 22, 2011, agents established surveillance in conjunction with interceptions of VILLA's conversations over **Target Phone 21** (Call Nos. 592 and 594) with ARMANDO, in which VILLA instructed ARMANDO to meet with INDIVIDUAL B at the corner of 22nd Street and Cicero Ave. Specifically, on July 22, 2011, at approximately 10:57 a.m. (Call #592), VILLA, using on **Target Phone 21,** had a phone conversation with ARMANDO, who was using telephone number (773) 418-9737.  During the conversation, VILLA instructed Armando to go and meet with INDIVIDUAL B.  Specifically, VILLA stated, "Look, go over to the south side with the Toyota guy."  [VILLA told Armando to meet with INDIVIDUAL B at Cicero and 22nd St / Cermak.]  Armando stated, "Uh-huh."  VILLA stated, "Over to Cicero and 2-2, from there you are going to follow him to his house so you won't be out on the street."  Armando stated, "Okay."  VILLA stated, "You understood, right?"  Armando stated, "Yes, 2-2."  On July 22, 2011, at approximately 11:43 a.m. (Call #594) , VILLA, who was using **Target Phone 21**, had another telephone conversation with ARMANDO, who was using telephone number (773) 418-9737.  During the conversation, VILLA informed ARMANDO that INDIVIDUAL B was running late.  Specifically, VILLA stated, "I forgot to call you, what's up?"  ARMANDO stated, "What did he say?"  VILLA stated, "He said give him 15 minutes because of traffic.  I think it's been about that long, right?"  ARMANDO stated, "Yeah, he got traffic on the 55 but he would be there in 15 minutes."  VILLA stated, "Alright."

On July 22, 2011, at approximately 11:45 a.m., surveillance agents in the area of 22nd Street and Cicero Avenue, in Chicago, observed an hispanic male, later identified as ARMANDO, exit a gold colored Toyota Camry, bearing IL license plate K98-6327, which was parked in a parking lot at the corner of Cicero Ave and Cermak Ave, in Cicero, IL and enter a grocery store.  Shortly thereafter, surveillance observed ARMANDO exit from the grocery store and enter the gold Toyota Camry.  At approximately 12:03 p.m., surveillance observed an Hispanic male later identified as INDIVIDUAL B arrive at the parking lot in a tan colored Toyota Truck, and park next to the gold Toyota Camry.  Surveillance then

worker for VILLA in his narcotic distribution activity.

        **a.**    **July Interceptions over VILLA's phones indicate that ARMANODO and VILLA received 1,000 pounds of marijuana from VARGAS.**

32.    On July 18, 2011, at approximately 2:28 p.m. (Call #482), VILLA, who was using **Target Phone 21**, had a telephone conversation with ARMANDO, who was using telephone number (773) 418-9737. During the conversation, VILLA told ARMANDO to pick up a load of marijuana. Specifically, VILLA stated, "Did you leave already?" ARMANDO stated, "I am on my way." VILLA stated, "It's just that there is one little problem. There are five pants that were left over there." [VILLA stated that there were five bundles of marijuana left to pick up.] ARMANDO stated, "Where?" VILLA stated, "In the same place and I want you to go and get them." ARMANDO stated, "Oh, alright, but in what? In this car?" VILLA stated, "Well, there's no other choice. The other thing is not ready." ARMANDO stated, "So do you want me to go right now?" VILLA stated, "Yeah, they are going to call

---

observed INDIVIDUAL B exit from the tan Toyota Truck and ARMANDO exit from the gold Camry and meet. Following the meeting, surveillance observed INDIVIDUAL B and ARMANDO enter their respective vehicles drive out of the parking lot. At that time, surveillance observed the tan Toyota Truck and gold Toyota Camry traveling in tandem, with the Toyota Camry following the Toyota Truck to a residence at 3424 or 3422 S. Cuyler, Chicago, IL. Shortly thereafter, surveillance observed both INDIVIDUAL B and ARMANDO walk into a residence located at either 3424 or 3422 S. Cuyler. At approximately 12:20 p.m., surveillance observed ARMANDO exit 3424 or 3422 S. Cuyler and depart the area in the gold Toyota Camry.

Based upon the the instructions given by VILLA and the subsequent actions of the Hispanic male driving the gold Toyota Camry, agents identified the driver as the individual intercepted on VILLA's phones as ARMANDO. ARMANDO was photographed on July 22, 2011, and recognized as the same person by agents in all subsequent surveillance where he is named in this complaint. A photograph of the person identified by agents as ARMANDO is attached and made a part of the proposed arrest warrant for JOHN DOE, aka "Armando," submitted to the Court with this criminal complaint.

you. This guy wants to leave, go ahead and get them. Then you can go over there later and take your time or is it on the way to where you are going?" ARMANDO stated, "No and also I have to unload all of my tools that I have here." VILLA stated, "You have tools there?" ARMANDO stated, "Yeah, my trunk is full of crap. I will go back and drop it off." VILLA stated, "Drop it off. Either way, that girl's presentation will be there anyways. They will call you and you let them know what time you will be there." ARMANDO stated, "Okay, and if they take as long as they did yesterday, oh well...." VILLA stated, "No, they say it will be right away. As soon as you get there, boom, and that's it." ARMANDO stated, "Okay." VILLA stated, "It's the last of it." ARMANDO stated, "Okay." VILLA stated, "Alright. They will call you."

33. On July 18, 2011, at approximately 4:40 p.m. (Call #496), VILLA, who was using **Target Phone 21,** had a telephone conversation with VARGAS, who was using push-to-talk number 135*828*1620.[9] During the conversation, VARGAS and

---

[9]    VARGAS was identified as the speaker on this call and the others listed in the complaint through the following means:
(1) In September, 2011, DEA Spanish speaking monitors recognized the voice of VARGAS intercepted speaking to VILLA on two separate phones. Specifically:
   A.    On September 15, 2011, at approximately 4:14 p.m. (Call #47), VILLA, who was using **Target Phone 30,** had a telephone conversation with VARGAS, who was using push-to-talk number 135*827*463. During the conversation, VARGAS informed VILLA that he was going to send VILLA one hundred kilograms of cocaine. Specifically, VILLA stated, "Good, good, hey sorry but I was a little busy. What's going on?" VARGAS stated, "Just here. Hey did your uncle call you?" VILLA stated, "Uh-huh, yeah he told me about it." VARGAS stated, "All right, because he told me to call you to tell you about the claretitos (clear ones)...that if someone would go over there with the claretitos." VILLA stated, "Yeah, no well my uncle said yes." VARGAS stated, "All right, did he tell you that it's going to be about a 'century?'   [VARGAS told VILLA that it's going to be about 100 kilograms of cocaine.] VILLA stated, "Yeah, so by when would that be?" VARGAS stated, "Well, I need to talk, but I am thinking it's probably going to be about 10 days." VILLA

VILLA discussed VILLA receiving 1,000 pounds of marijuana from VARGAS. Specifically, VARGAS stated, "The radios are not working, right?" VILLA stated, "They are failing a little. Yeah, the old man [ARMANDO] is on his way already."

---

stated, "All right, that's fine and what about the number? Is it going to be what my uncle said?" VARGAS stated, "Well, he told me at 6." [VARGAS said one kilogram of cocaine for $26,000.] VILLA stated, "Okay, that's good." VARGAS stated, "All right, that's fine. I'll give you a call to verify that with you." VILLA stated, "All right."

B.    On September 17, 2011, at approximately 4:46 p.m. (Call #85), VILLA, who was using **Target Phone 30**, had another telephone conversation with VARGAS, who was using push-to-talk number 135*831*3888. During the conversation, VILLA informed VARGAS that his runner was unable to deposit narcotics proceeds in the bank for VARGAS. Specifically, VILLA stated, "Go ahead." VARGAS stated, "Hello?" VILLA stated, "What's up? How are you?" VARGAS stated, "Hey, I called you...is this your other number?" VILLA stated, "What?" VARGAS stated, "This is another number?" VILLA stated, "Yeah, well this the one you called me on a while ago." VARGAS stated, "All right. I thought one of my cousins from Michi [PH] was calling me. Sorry about that." VILLA stated, "Oh, no that's not a problem. Hey, I called this guy and he didn't have time to go put that but they haven't closed there, so maybe they are still going to be able to do it, it's just that they are a little busy." [VILLA stated that his worker had not been able to make it to the business to send money.]

(2) On the basis of these phone calls, on October 21, 2011, Chief Judge James F. Holderman signed an order granting the use of cellular location technology to locate push-to-talk number 135*827*463 and push-to-talk number 135*831*3888.

(3) On November 2, 2011, cellular location information for push-to-talk number 135*827*463 and push-to-talk number 135*831*3888 indicated that both phones were located at 1316 Santa Fe, Alton, TX (the "Alton Residence"). At the request of investigating agents, members of the Alton, Texas Police Department knocked on the door of the Alton Residence and were greeted by a woman who identified herself as Irma Vargas. When asked, she stated that her husband was in the shower but that his name was "Rodolfo Vargas."

(4) On July 9, 2011, at approximately 2:28 p.m., (Call #197) VILLA, who was using **Target Phone 21**, had a telephone conversation with VARGAS, who was utilizing push-to-talk number 135*828*1620. During the conversation, VARGAS told VILLA the name of his wife while giving VILLA instructions on where to wire money. Specifically, VILLA stated, "Give it to me." VARGAS stated, "The number is 2650743370 and it's to Bank of America." VILLA stated, "2650743370. Under what name?" VARGAS stated, "Under the name of Irma Vargas, that's my wife." DEA monitors compared the voice of VARGAS on the September phone calls above with the voice of this call and recognized him as the same speaker.

Given that VARGAS had previously identified his wife's name in July, 2011 as "Irma Vargas," and that two phones VARGAS had been intercepted using were located at the Alton Residence with Irma Vargas on November 2, 2011, and that Mrs. Vargas identified her husband as "Rodolfo Vargas," agents identified VARGAS as the speaker in this and the other identified calls in this affidavit.

[VILLA informed VARGAS that ARMANDO was ready to receive the narcotics.] VARGAS stated, "That's good, call me when he gets there." VILLA stated, "All set, how many 'pants' did they tell you they gave me yesterday?" VARGAS stated, "They were supposed to be...it was 41 yesterday and 5 today." [VARGAS told VILLA that VILLA should have received 41 bundles of marijuana yesterday and 5 bundles of marijuana today.] VILLA stated, "I don't know how many they gave him right now, but yeah, they were 41 yesterday...exactly." [VILLA confirmed receiving 41 bundles of marijuana.] VARGAS stated, "Yeah, they were missing 5 only, but it was 46 total." VILLA stated, "Yeah, it's fine." VARGAS stated, "Right, I'm not sure about the 'size' of the pants,10 but it has to be 1,000 total." [VARGAS informed VILLA that he should receive a total of 1,000 pounds of marijuana.] VILLA stated, "All right, you'll check it, right?" VARGAS stated, "Yeah, I'm not sure why am I going to lie to you, but it has to be 1,000 total." VILLA stated, "Okay, it's fine." VARGAS stated, "All right, thanks."

34. On July 28, 2011, at approximately 7:22 p.m. (Call #3), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using telephone number 646-649-7314 (hereinafter "ARMANDO Phone").

---

10     Agents identified the narcotic as marijuana, based upon repeated interceptions following this call in which VILLA, VARGAS and ARMANDO referred to the "pants" as "size 22." For instance, also on July 18, 2011, at approximately 6:04 p.m. (Call #499), VILLA and VARGAS again discussed the marijuana shipment and referred to "size 22 pants," when discussing the follow up delivery of 5 bundles. Specifically, VILLA stated, "Yeah, the guy with the 'clothes' arrived already. They only gave him four 'pants' on 'size 22' and one 'size 11.'" VARGAS stated, "All right. Dude, I'm not going to lie to you, I don't know the sizes but they have to be a thousand." [VARGAS stated that he did not know the size of the bundles of marijuana, but the total amount would add up to 1,000 pounds.] In my training and experience, 22 pounds is a common packaging amount in the wholesale transport of marijuana, and based upon these discussions the investigation determined the item to be 1,000 pounds of marijuana. The total weight of 45, 22 pound bundles of marijuana would be 990 pounds, plus one 11 pound bundle, would be 1,001 pounds, as VARGAS projected.

During the conversation, VILLA and ARMANDO discussed a recent narcotics payment ARMANDO collected and the collection of an overdue drug debt from the recipient. Specifically, VILLA stated, "What's going on?" ARMANDO stated, "The thing with the girl was good, man." [ARMANDO explained that the money collection for previously fronted narcotics went well.] VILLA asked, "At 15?" [$150,000.] ARMANDO responded, "Yes." VILLA asked, "Did you remind him about the past-due?" [VILLA asked if ARMANDO had reminded the customer about the payment the customer owed for previously fronted narcotics.] ARMANDO responded, "No, I didn't. I thought you had told him." VILLA stated, "I forgot. But you'll see him later on, so don't get too busy doing stuff because you are going to see him in a little bit. They are going to give you another 'Pique.'" ARMANDO stated, "Who?" VILLA stated, "The girl." ARMANDO stated, "Also, the one with the blue said he would see me later on." [ARMANDO told VILLA that another drug customer stated that he had money for previously fronted narcotics.] VILLA stated, "Alright then, just be ready."

### b. VILLA and ARMANDO deliver marijuana to INDIVIDUAL B on August 2, 2011.

35. Based in part upon the interceptions listed above, on August 1, 2011, the government obtained a Court order permitting authority to use cellular location technology to locate the ARMANDO Phone, used by ARMANDO.

36. On August 2, 2011 at approximately 6:12 a.m. (Call #201), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using telephone number (646) 649-7314. During the conversation, VILLA told

ARMANDO to give three bundles of marijuana to INDIVIDUAL B. Specifically, ARMANDO stated, "Good morning, I was just about to get in the shower." VILLA stated, "Look, the guy with the Toyota is coming and we're going to give him the last three we have left. There's three left, right?" ARMANDO stated, "Okay, yes." VILLA stated, "Or how many are left?" ARMANDO stated, "Yes, three." VILLA stated, "Okay, that's what we're going to give him." ARMANDO stated, "So he's coming now?" VILLA stated, "He said he would be coming around 7:30, so you have time to shower and all." ARMANDO stated, "Yes, that's true." VILLA stated, "Okay, I'll call you."

37. On August 2, 2011, at approximately 11:28 a.m. (Call #854), VILLA, who was using **Target Phone 23**, had a telephone conversation with INDIVIDUAL B, who was using IMSI 316010112009733. During the conversation, INDIVIDUAL B informed VILLA that he was ready to pick up marijuana from VILLA. Specifically, INDIVIDUAL B stated, "I want to stop by and say hello." VILLA stated, "Okay, for that or just to say hello." INDIVIDUAL B stated, "Well, I'm going to go see you and to get served." [INDIVIDUAL B informed VILLA that he was ready to pick up marijuana.] VILLA stated, "Alright, how long is it going to take for you to get here?" INDIVIDUAL B stated, "About 30 minutes due to traffic." VILLA stated, "Okay, we'll wait for you. I'll tell the old man to be there." [VILLA stated that ARMANDO would be meeting INDIVIDUAL B.] INDIVIDUAL B stated, "Okay, I'll see him where we usually park."

38. Based, in part, upon the calls intercepted above, on August 1, 2011,

Chief Judge James F. Holderman signed an order permitting the use of cellular location information on the phone used by ARMANDO, telephone number (646) 649-7314. On August 2, 2011, at approximately 11:45 a.m., based upon the interceptions above and cellular location information for ARMANDO's phone, agents established surveillance in the area of Saint Genevieve Catholic School, 4854 West Montana Street, Chicago, Illinois. Upon arrival at 4854 West Montana Street, surveillance observed a gray 1991 Toyota Camry bearing Illinois temporary license plate 823M545, registered to Gerardo Arroyo, 428 Carmel, Bolingbrook, Illinois (the "Camry"), parked on the northwest corner of Lamon Avenue and Montana Street. Agents had previously identified this vehicle as a vehicle utilized by ARMANDO. Surveillance observed the individual that they had previously observed in surveillance in conjunction with interceptions of his conversations over VILLA's phones and determined to be ARMANDO standing outside the vehicle on the corner.

39.     On August 2, 2011, at approximately 12:27 p.m. (call #216), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using the ARMANDO Phone. During the conversation, VILLA advised ARMANDO that INDIVIDUAL B was in the area. Specifically, VILLA stated, "He says he's there." ARMANDO replied, "I am here as well." VILLA stated, "He said he's inside a gray one." ARMANDO answered, "Mm...let me look for him because I don't see him."

40.     At approximately 12:36 p.m., surveillance agents watching ARMANDO

34

saw a gray Toyota Sequoia, Illinois vehicle registration K116584, (the "Sequoia") double park next to the Camry. Surveillance observed the Sequoia reposition and park behind the Camry. At this time, surveillance agents lost sight of the Camry. At approximately 12:42 p.m., cellular location information for ARMANDO's phone (646-649-7314), indicated that it was likely located in the area of 2308 North Laramie Avenue, Chicago, Illinois. Shortly thereafter, surveillance located the Toyota Camry parked in front of 2308 North Laramie Avenue.

41.    On August 2, 2011, at approximately 12:51 p.m. (call #223), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using the ARMANDO Phone. During the conversation, ARMANDO advised VILLA that INDIVIDUAL B's truck was locked. Specifically, ARMANDO stated, "Tell that guy the truck is locked." VILLA responded in an intercepted background conversation, "He says it's locked...the car door is locked." In the background, intercepted over the phone, INDIVIDUAL B stated, "No, it's open." VILLA responded to Armando, "He says it's open. He says he left the keys in the ashtray. Did you check all the doors already?" ARMANDO replied, "Let me see, because I saw that it was locked. Let me call you back." VILLA responded, "Okay."

42.    On August 2, 2011, at approximately 12:53 p.m. (call #224), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using the ARMANDO Phone. During the conversation, ARMANDO advised VILLA the truck was locked. Specifically, ARMANDO stated, "Tell him it's locked. [U/I] it's locked." VILLA replied, "I'm here with the man. He said he'll go

35

unlock it." ARMANDO responded, "Okay."

43.     Based on the intercepted telephone calls above, surveillance returned to the area of Saint Genevieve Church. Upon arrival at that location, surveillance surveillance observed the unoccupied Sequoia parked on the southeast corner of Lamon Avenue and Montana Street. Surveillance also observed a maroon Ford truck parked on Lamon Avenue north of Montana Street. Agents had previously identified this vehicle as a vehicle utilized by VILLA. Surveillance agents did not observe the Ford depart the area. Agents maintained surveillance on the Sequoia.

44.     At approximately 12:54 p.m., surveillance observed ARMANDO standing at the corner of Fullerton Avenue and Lamon Avenue looking northbound on Lamon Avenue. Surveillance then observed ARMANDO leave the area on foot heading west on Fullerton Avenue. Surveillance lost sight of ARMANDO at that time.

45.     At approximately 1:10 p.m., cellular location information for ARMANDO's phone (646-649-7314) indicated that it was likely located in the area of 4428 West Deming Place, Chicago, Illinois. Based on that information, agents established surveillance in that area. At approximately 1:23 p.m., surveillance observed a silver Toyota Tacoma truck in the area of 4428-4430 West Deming Place. Agents were unable to determine which garage the vehicle departed from. Agents had previously identified this truck as a vehicle used by INDIVIDUAL B on July 22, 2011, during a prior observed meeting with ARMANDO.

36

46.     On August 2, 2011 at approximately 1:08 p.m. (Call #225), VILLA, who was using **Target Phone 24**, had a telephone conversation wtih ARMANDO, who was using telephone number (646) 649-7314.  During the conversation, ARMANDO told VILLA that he was unable to fit the three bundles of marijuana into INDIVIDUAL B's vehicle.  Specifically, ARMANDO stated, "Tell him that all three don't fit, only two.  Ask if I should put the other one back there."  VILLA then stated in background conversation, "Listen, he said all three don't fit, should he put the other one on the back?"  INDIVIDUAL B then stated in the background conversation, "All three don't fit?"  ARMANDO stated, "No."  VILLA stated in the background conversation, "No just the two."  Again on the phone, VILLA stated to ARMANDO, "He says that just the two."  ARMANDO stated, "Okay, which one should I leave?  The one we had made over here, or the other one?"  [ARMANDO asked VILLA which of the three bundles of marijuana he should leave out of those given to INDIVIDUAL B.]   VILLA stated, "Uh...leave the one I undressed."  ARMANDO stated, "Excuse me?"  VILLA stated, "The one that was undressed."  ARMANDO stated, "Okay."

        c.     **VARGAS and VILLA orchestrate the delivery of $311,000 in drug proceeds which is seized by law enforcement from SALINAS.**

47.     On August 5, 2011, VILLA and VARGAS spoke in a series of intercepted calls over **Target Phone 24** about sending narcotics proceeds for previously fronted marijuana with a courier to Mexico.  During the calls, VARGAS provided specific instructions to VILLA on how to package the narcotics proceeds for

transport.

48.     On August 5, 2011 at approximately 2:17 p.m. (Call #453), VILLA, who was using **Target Phone 24**, had a telephone conversation with VARGAS, who was using push-to-talk number 135*828*1620.    During the call, VARGAS informed VILLA that the courier would be in the area early the next morning and instructed VILLA on how to package the narcotics proceeds for transport.    Specifically, VARGAS said, "Could you do me a favor for tomorrow? The guy is going to be there early tomorrow for the title of the car, could you put it in bags?"    [VARGAS instructed VILLA to place the narcotics proceeds into bags.]    VILLA responded, "Can I put it how?"    VARGAS said, "In those nice bags?"    VILLA said, "Yeah, actually that's how I'm doing it all."    VARGAS said, "Could I give you some measurements so you know the thickness and everything?"    VILLA said, "What's the measurement?"    VARGAS said, "Thickness is like three inches from side to side. . . not the length but thick is three inches and wide is like two dollar bills. The most [U/I] is like 12. . . .You know how they put them [U/I] and then the length is another 12."    VILLA said, "Wide, you said three inches?"    VARGAS said, "Yeah, from the ground up is three inches?" VILLA said, "Okay, that's fine."

49.     A few minutes later, at approximately 2:19 p.m. (Call #454), VILLA, who was using **Target Phone 24**, had a telephone call with VARGAS, who was using push-to-talk number 135*828*1620.    During the call, VARGAS explained that the courier stored the narcotics proceeds in a particular way and that the proceeds needed to fit or else the courier would not take the proceeds.    Specifically, VILLA

said, "You wanted me to prepare it, [U/I] namesake?" VARGAS said, "However you want, you know that he arrives in one of those big worms." [VARGAS told VILLA that the courier would be driving a tractor-trailer.] VILLA said, "Oh, okay, I understand you. So how do you want us to do it?" VARGAS said, "Yeah, more or less like I told you. Then when the guy gets there, gives you a call, sees you on the street somewhere. You give it to him and he does his job." VILLA said, "Oh, but for them to already be like that, right?" VARGAS said, "Yeah, that's an advantage." VILLA said, "And however they are as long as they don't pass that three measurement." VARGAS said, "Yeah, and the length not to pass 12. That would be very good." VILLA said, "The length is a normal measurement for each." VARGAS said, "Yeah, because this guy arranges them by two. He puts in the tip boom until it hits, then the other tip behind until that hits, then the other tip behind that, as long as it doesn't pass three. . . and you arrange like two bills to the side, depending the bags you use, so that the meat doesn't go to waste." VILLA said, "Okay, I understand you. So then . . . [U/I] the other one there, depending on the bag, right?" VARGAS said, "Yeah, and if there's a way for you to number them, if you can or just do one quantity and you tell me what came and that. We'll arrange it over here, too." VILLA said, "Okay, that's fine." VARGAS said, "There's no problem, right?" VILLA said, "No, like at what time will that guy get here?" VARGAS said, "Like after midday." VILLA said, "Okay, and what number? Whatever there is?" VARGAS said, "Yeah, whatever there is. Hopefully, there's none left over because if . . . you know, there's nowhere for the guy to store it, he'll have to return it." VILLA

asked, "What did you say?" VARGAS said, "Whatever there is . . . if it doesn't fit in the refrigerator where the guy is, he's going to reject it, he'll take it back to you." VILLA said, "Okay."

50.    At approximately 3:36 p.m. (Call #469), VILLA, who was using **Target Phone 24**, had a telephone call with VARGAS, who was using push-to-talk number 135*828*1620. During the call, VARGAS told VILLA that he had spoken to the courier and relayed instructions to VILLA for the following day. Specifically, VARGAS said, "I talked to the guy, and he said that he will go, but let me give you the number so you can call him like at 7:00 in the morning so you can tell him to go by them. They pick him up and you take him there and give him the 'measurements.'" VILLA said, "I like the idea. Give me the number." VARGAS said, "Hold on."

51.    Approximately one minute later, at 3:38 p.m. (Call #470), VILLA, who was using **Target Phone 24**, had a telephone call with VARGAS, who was using push-to-talk number 135*828*1620. During the call, VARGAS gave VILLA the courier's phone number and told him to call the courier to make arrangements. Specifically, VARGAS said, "The number is 458-1897, Primito [little cousin]." VILLA asked, "What's the area?" VARGAS said, "It's the one from where I'm at. It's 956. And he's Primito." VILLA said, "956 and we should ask for Primito. Alright, we'll give him a call at 7:00 in the morning." VARGAS said, "Alright, give him a call and he should go by you so you can make arrangements."

52.    On August 6, 2011, at approximately 6:30 a.m., agents established

40

surveillance in the area of 2308 Laramie Avenue in Chicago, where surveillance had previously observed ARMANDO and believed ARMANDO resided. Surveillance agents had previously observed ARMANDO driving the Camry.

53. On August 6, 2011, at approximately 7:33 a.m., surveillance observed ARMANDO enter the Camry and drive eastbound on Fullerton towards Lamon Avenue, parking in front of a maroon pick-up truck. Surveillance was unable to see the license plate of the maroon pick-up truck. Surveillance observed ARMANDO leave the Camry and enter the passenger side of the pick-up truck. Shortly thereafter, surveillance observed ARMANDO leave the pick-up truck carrying a small package and re-enter the Camry. At approximately 7:40 a.m., surveillance observed ARMANDO return to 2308 Laramie Avenue.

54. On August 6, 2011, at approximately 8:02 a.m. (Call #505), VILLA, who was using **Target Phone 24**, had a telephone conversation with SALINAS, who was using telephone number (956)458-1897.[11] During the call, VILLA and SALINAS discussed SALINAS's location and that VILLA would send someone to meet SALINAS. Specifically:

a. VILLA asked, "Where are you?" SALINAS responded, "I'm over here by the 57, over here in Monee. I didn't know where to go. That guy didn't tell me about anywhere closer. Where would it be good?" VILLA said, "Over here by...

---

11 The identification of SALINAS as the user of telephone number (956) 458-1897 is based on the following: (1) in call #470, VARGAS identified that number as belonging to the courier; (2) the content and context of the intercepted calls between VILLA and the user of telephone number (956) 458-1897; and (3) law enforcement subsequently conducted a traffic stop of SALINAS, who was driving a tractor-trailer that contained the $311,000 in U.S. Currency hidden in a trap compartment. During the traffic stop, the driver was identified through a driver's license as BENITO SALINAS.

You are all the way by [U/I], by 57?" SALINAS said, "The 57 and 80." VILLA said, "Yeah, I know where that is. We're all the way over here by the north side. Well, you can take 290 and just go north." SALINAS asked, "Oh, you are on the north side?" VILLA responded, "Yeah." SALINAS then said, "No, well that's fine. I'll go over there."

      b.    VILLA asked, "Are you on a small car?" SALINAS said, "No, No, I have a big animal. That's why I have to be careful where I go, right?" [SALINAS informed VILLA that he has a tractor-trailer, rather than a car, with which to transport the drug proceeds.] VILLA said, "Yeah." SALINAS then said, "I have a big animal. Supposedly they were going to pick me up and figure this out. So we could talk and make no mistakes." VILLA said, "But you're good over there where you are at now, right?" SALINAS responded, "Yes, I'm good over here. There's only big animals over here and that's why I came over here. There's places up there. I can get closer, just like you said . . . .There's warehouses there by where I've gone to load." VILLA asked, "Where?" SALINAS responded, "There by Plaines." VILLA asked, "In Des Plaines?" SALINAS said, "Yes, Des Plaines. I've been there before. There are warehouses there, but I don't know, you tell me. I can get as close as possible." VILLA said, "Yeah, look, just get as close as you can and I'll send someone over there to get you."

      c.    Later in the conversation, SALINAS said, "So, 290 and what else?" VILLA said, "Uh, well you have to pass downtown and then any street, you can exit on Western, or Fullerton. If you take 57, and then take 290... You take it

right there, you'll pass downtown, and you exit on Western and Fullerton. And just stay around there." SALINAS said, "So Fullerton?" VILLA responded, "Yes, Fullerton west." SALINAS said, "Okay, all right well let me just get a map and we can figure it out." VILLA said, "Yeah, but take your time." SALINAS said, "Well, let me get out of here. I was just getting out of the shower." VILLA said, "No, no, go ahead and take a shower and then you can call me." SALINAS said, "No, no, I already took a shower. It's just that I want to have enough time to go there, I mean there's not much traffic but either way." VILLA said, "Yeah."

      d.     Later, SALINAS said, "Okay... Right now I'm at... [pause] okay... 290, I'll pass downtown, so I'm going to be there around Maywood, Oak Park around there or what?" VILLA said, "Yeah, by Oak Park is good, too." SALINAS said, "By Oak Park . . . . Then I should go more west or . . . ? " VILLA said, "No, no, [U/I] by Oak Park, and all that?" As the call continued, SALINAS and VILLA continued to discuss directions and the location at which to meet, ultimately agreeing to meet in North Lake. At the end of the call, SALINAS said, "Yes, I'll give you a call when I get closer." VILLA responded, "Alright, then North Lake sounds good."

      55.     On August 6, 2011, at approximately 10:34 a.m. (Call #513), VILLA, who was using **Target Phone 24**, had a telephone conversation with VARGAS, who was using push-to-talk number 135*828*1620. During the call, VARGAS and VILLA discussed the arrangements with the courier. Specifically, VARGAS asked, "What did the guy say?" VILLA said, "Uh, he's coming closer. The thing was that he was a little far away." VARGAS said, "Alright, it's fine. You'll give me a call,

right?" VILLA said, "Yeah, I'll give you a call. He already told me where he's going to be and then the old man [ARMANDO] will pick him up and then they'll head over there. It's easy." VARGAS said, "That's good. Give me a call later on." VILLA said, "Okay."

56. On August 6, 2011, at approximately 10:58 a.m. (Call #515), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using the ARMANDO Phone. During the call, VILLA gave ARMANDO a phone number and instructions to meet a money courier. Specifically, VILLA said, "Hey, do you have something to write a number on?" ARMANDO responded, "Let me look. . .Okay, go ahead." VILLA said, "The area is 956 . . . 458-1897." ARMANDO repeated, "956-458-1897." VILLA said, "Uh-huh. Listen, go there to Grand Avenue and Mannheim, by the Rio Valley. You know where, right?" ARMANDO responded, "Okay, yes." VILLA said, "Yeah, take Grand until you hit Mannheim and right there there's a little plaza, a store that's called Rio Valley. Have you seen it?" ARMANDO said, "No, I haven't, but I'll look for it." VILLA said, "Uh-huh. The guy with the 'letters' is there, so go get him. He's waiting for you there already." [VILLA instructed ARMANDO to meet SALINAS, who was waiting for ARMANDO.] ARMANDO said, "Okay, I'm on my way there."

57. On August 6, 2011, at approximately 11:14 a.m. (Call #518), VILLA, who was using **Target Phone 24**, had a telephone conversation with SALINAS, who was using telephone number (956)458-1897. During the call, VILLA told SALINAS that an old man, referring to ARMANDO, was going to pick up SALINAS.

44

Specifically, VILLA said, "What's going on, 'Primito' [cousin]?" SALINAS said, "Nothing, nothing. Did you call me?" VILLA said, "Yeah, I called you." SALINAS said, "Oh, okay, it's because I'm in the store. I didn't hear." VILLA said, "Yeah, in about 10 minutes." SALINAS said, "Yeah, that's fine. I'm here inside the store by the vegetables, just let me know and I'll go outside." VILLA said, "Alright, an old man [ARMANDO] is going to pick you up." SALINAS said, "Alright." VILLA stated, "And he's going to call you. He has your number, okay?" SALINAS said, "Okay, alright, thank you."

58. On August 6, 2011, at approximately 11:11 a.m., surveillance observed ARMANDO enter the Camry and drive westbound on Fullerton Avenue. At approximately 11:38 a.m., ARMANDO drove into the Rio Valley Market located at the intersection of Fullerton Avenue and Mannheim Road in Melrose Park, Illinois. Shortly thereafter, surveillance observed an older Hispanic male, who was later identified as BENITO SALINAS, step out of a tractor-trailer, bearing Texas license plate RF2W39, and enter the Camry.

59. On August 6, 2011, at approximately 11:57 a.m. (Call #520), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using the ARMANDO Phone. During the call, VILLA confirmed that ARMANDO had brought the narcotics proceeds, and ARMANDO informed VILLA that he was with the courier. Specifically, VILLA said, "You called?" ARMANDO responded, "A little while. I was calling the other number so I accidentally dialed. We're here with the guy, [SALINAS] so I'll call you later." VILLA said, "But are you

guys over there at his house?" ARMANDO said, "Yeah." VILLA said, "Okay, just make sure you check. You know that you brought the 2-20, right?" [$220,000 in narcotics proceeds.] ARMANDO said, "Yeah, that's right." VILLA said, "Just not the envelopes, alright?" ARMANDO said, "No, no, that's separate." VILLA said, "Yeah, make sure everything is in order, alright?" ARMANDO said, "Okay."

60.     Surveillance then observed the following:

a.     At approximately 12:00 p.m., the Camry returned to 2308 Laramie Avenue. ARMANDO and SALINAS exited the Camry and entered the residence.

b.     At approximately 12:43 p.m., ARMANDO and SALINAS exited 2308 Laramie Avenue and walked toward the Camry. SALINAS was carrying a black duffel bag with light-colored trim. SALINAS entered the front passenger seat and ARMANDO entered the driver's seat.

c.     At approximately 1:10 p.m., the Camry returned to the Rio Valley Market. Shortly thereafter, SALINAS placed the black duffel bag into the driver-side of the tractor-trailer.

d.     At approximately 1:26 p.m., SALINAS walked from the truck tractor to the rear end of the truck trailer carrying the same black duffle bag. When SALINAS arrived at the rear end of the truck trailer, he placed the black duffel bag inside the truck trailer and returned to the truck tractor empty handed. At approximately 1:50 p.m., SALINAS and the passenger of the truck tractor walked southbound on the east side of the truck tractor and trailer to the rear end of the

truck trailer. At this time, SALINAS climbed into the truck trailer, and the passenger closed and secured the trailer doors behind him. Shortly thereafter, the passenger walked north and returned to the truck tractor, climbing inside.

e. At approximately 2:09 p.m., the tractor-trailer exited the Rio Valley Market parking lot and headed south on Mannheim Road. At approximately 2:30 p.m., the tractor-trailer entered a parking lot located at 190 South Mannheim in Hillside, Illinois.

f. At approximately 3:38 p.m., the tractor-trailer exited the parking lot towards the Interstate 290 and heading eastbound. The tractor-trailer then drove eastbound on Interstate 90/94 and later to 80/90 East to 94 East towards Detroit, Michigan.

61. On August 6, 2011, at approximately 2:09 p.m. (Call #527), VILLA, who was using **Target Phone 24**, had a telephone conversation with ARMANDO, who was using the ARMANDO Phone. During the call, ARMANDO informed VILLA that the delivery of the narcotics proceeds was finished. Specifically, ARMANDO said, "It's done." VILLA responded, "Uh-huh." ARMANDO said, "Yeah, I gave him the emergency number . . . 311." VILLA said, "Alright, that's good. Did he already go over there?" ARMANDO said, "Yeah." VILLA asked, "Are you on your way back?" ARMANDO said, "Yeah, that too."

62. On August 6, 2011, at approximately 5:30 p.m., Indiana State Police (ISP), with the assistance of the Michigan State Police (MSP), conducted a traffic stop on the tractor-trailer at New Buffalo, Michigan. The driver, who was identified

as BENITO SALINAS from a Texas driver's license, consented to a search of the tractor-trailer. During a search of the refrigerator compartment, law enforcement located approximately $311,000 in cash, which was wrapped in plastic wrap and duct tape, in a hidden compartment inside the refrigerator compartment of the tractor-trailer. In order to preserve the covert nature of the investigation, law enforcement seized the cash. Law enforcement did not interview SALINAS regarding his drug-trafficking activities.

63. On August 8, 2011 at approximately 2:26 p.m. (Call #648), VILLA, who was using **Target Phone 24**, had a telephone conversation with VARGAS, who was using IMSI 316010115503766. During the conversation, VARGAS told VILLA to stop using VILLA's phone because VARGAS's driver SALINAS, who picked up narcotics proceeds from VILLA, was stopped by the police. Specifically, VARGAS said, "Can you talk?" VILLA stated, "Yes." VARGAS said, "Listen, why don't you get a new number. It seems that this guy [SALINAS] has a little problem." VILLA stated, "Who?" VARGAS said, "The guy, the guy you saw over there. The one that polished your car." [VARGAS informed VILLA that SALINAS had been stopped by law enforcement.] VILLA responded, "Fucking shit. Okay, I'll get one." VARGAS said, "Okay, because they took his device from him for a little bit and returned it to him. They might've gotten some numbers off of it." [VARGAS told VILLA that law enforcement had taken his SALINAS's phone and may have retrieved telephone numbers, including VILLA's from the phone.] VILLA said, "Okay, do you think he spoke to the old man [ARMANDO], too? I think so, right?" VARGAS stated, "Yes,

because I didn't talk to that man. I think we shouldn't take the risk. What if they got the numbers?" VILLA stated, "Okay, we'll do that right now." VARGAS said, "Yes, and call me back." VILLA said, "Look, I'll give it to my uncle and he can call you."

64. As of August 9, 2011, VILLA has not used **Target Phone 24**.

## IV. CONCLUSION

WHEREFORE, I submit that there is probable cause to support a complaint charging:

a. JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;" and EZEQUIEL LOPEZ, aka "Kili;" with conspiring with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, 1000 grams or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance, , in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846; and

b.     JORGE VILLA, aka "Salvador Lopez," aka "Jorge," aka "Johnny," aka "Sobrino;" RODOLFO VARGAS, aka "Junior," JOHN DOE, aka "ARMANDO," and BENITO SALINAS with conspiring with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

Neeshan Tulshi
*Special Agent*
Drug Enforcement Administration

SUBSCRIBED and SWORN before me on November 4, 2011.

HONORABLE ARLANDER KEYS
Magistrate Judge, United States District Court
Northern District of Illinois